Estate of Meyer Goldberg, Deceased, Abraham Goldberg and Solomon Goldberg, Executors v. Commissioner.
Estate of Meyer Goldberg v. Commissioner
Docket No. 26515.
United States Tax Court
1951 Tax Ct. Memo LEXIS 79; 10 T.C.M. (CCH) 977; T.C.M. (RIA) 51303; October 4, 1951
*79 Decedent, in a partnership with two sons, had $40,000 of his own capital account transferred to each son. He retained the same percentage interest in the profits that he had prior to such transfer. At the same time he gave his share of preferred stock of a corporation, which stock was held by the partnership, to a third son. Such gifts were made about four years prior to decedent's death, when he was about 72 years old, but in good health. Held, none of the gifts were made in contemplation of death, nor were they gifts intended to take effect at or after death. Benjamin E. Shove, Esq., for the petitioners. Aaron S. Resnick, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion The respondent determined a deficiency *80 in estate tax in the amount of $28,851.63. The only issue before this Court is whether certain transfers by decedent to his three sons in the total amount of $95,000 were made in contemplation of death, or were intended to take effect at or after death. No other adjustments are contested. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found, and are incorporated herein. Meyer Goldberg (hereinafter referred to as decedent) died on August 11, 1945, a citizen of the United States and a resident of Syracuse, New York, leaving a gross estate of about $200,000 exclusive of the gifts here in question. He left a last will and testament which was admitted to probate in the Surrogates Court of Onondaga County, New York, on October 29, 1945. Letters testamentary thereof were issued by that court on October 29, 1945, to Abraham Goldberg and Solomon Goldberg. Decedent was born in 1869. He had four sons, Barney, Solomon, Moses, and Abraham. At the time of his death, he was survived by his widow and three of his sons, Moses having predeceased him. Shortly after decedent and his family came to the United States, in the early 1900's, decedent opened a store *81 in Syracuse, New York, selling pots and pans, utensils and household supplies. He subsequently sold this business. Early in 1913 decedent opened a furniture store in Syracuse, dealing chiefly in second-hand furniture. Some new furniture was handled also. In 1911 decedent's oldest son, Barney, began a jewelry business of his own. Prior to 1918, Moses, decedent's third son, worked for decedent. In 1918 Moses was drafted; and upon his discharge, refused to return to work for decedent since he could not make an adequate living working for his father. He went to work for Barney for a short time. Early in 1919 decedent approached Barney and Moses and suggested they go into business together since decedent was not making an adequate living in his own business. The three then formed a partnership under the name of M. Goldberg & Sons, selling new furniture and jewelry. Barney put his own jewelry business into the partnership. At first the partnership rented a store, but about 1923 it bought the property and thereafter from time to time purchased and leased property adjacent to such building as their business expanded. They were located in what has since became the principal furniture store *82 block in Syracuse. At first the three partners shared equally in the profits; but shortly after the partnership formation, because of Barney's complaint, profits were shared on a basis of 40 per cent to Barney, and 30 per cent each to Moses and decedent. Moses subsequently purchased a five per cent interest from Barney, and thereafter profits were shared on the basis of 35 per cent each to Barney and Moses, and 30 per cent to decedent. Barney was sales manager, office manager, and financial manager. Moses did the buying and was general merchandise manager. Both Barney and Moses also sold on the floor when necessary. Decedent was a smart business man, but was not a good salesman. He acted as a sort of general overseer in the store, being on the floor most of the time. Barney and Moses worked long hours being handicapped by lack of help. Beginning in the 1930's decedent went to Florida for the winters leaving same time in December and returning some time in April. When not on vacation, decedent came to the store every day about 8:00 or 8:30 in the morning and stayed until closing at night. He maintained these hours until a week before he died, when he was stricken with the illness *83 that caused his death. The partnership was successful. Its business and profits grew. Since the business was primarily a credit business, it required large inventories and a large amount of capital so that most of the profits were left in the business. Its income tax returns were filed on the installment basis. At the end of each year of the partnership, the partners' respective shares in the profits of the business were credited on the partnership books to their capital accounts. On January 1, 1941, the partnership books showed the following credit balances in the capital accounts of the three partners: decedent, $110,551.03; Moses, $108,585.08; and Barney, $121,211.48. These balances did not reflect the partners' shares in the account entitled, "Reserve for Unrealized Gross Profits," an account growing out of the installment sales accounts receivable. Giving effect to this account, the capital account of decedent would have been increased by about $70,000, and the capital accounts of Barney and Moses by about $82,000 each. Decedent's second son, Solomon, was not as successful in business as his brothers. At the time of the partnership formation, Solomon sold jewelry. He moved *84 to Rome, New York, and went into partnership with decedent's fourth son, Abraham. After selling his interest to Abraham, he returned to Syracuse and bought the Jewelry Department of M. Goldberg & Sons, but was unable to make a success of it. Decedent was always opposed to opening up new stores. However, when Solomon failed to make a success of the Jewelry Department of M. Goldberg & Sons, he asked Barney and Moses to open a store and take Solomon in as a partner. They did so and opened a store in Fulton, New York, which was financed by the Syracuse partnership. The Fulton partnership was subsequently incorporated, and the Syracuse partnership took preferred stock in payment of the money it had loaned the Fulton partnership. In December, 1939, just before decedent left for Florida, Barney and Moses had various discussions with decedent. Similar discussions occurred in 1940 and 1941. The substance of such discussions was to the effect that decedent should "do something" for Barney and Moses because they were responsible for the success of the business and, in large part, for decedent's financial success. Decedent always said that he would take care of them, that they should not worry, *85 and that he would see to it a little later. In none of these conversations was any amount ever stated. Upon decedent's return from Florida in 1941, Barney and Moses again reminded him that he had promised to do something for them. Decedent thereafter conferred with Albert Orenstein, an attorney at law in Syracuse, who had done a little legal work for decedent. At this conference, decedent told Orenstein that Barney and Moses had been talking to him about the fact that they felt they were entitled to some other interest or return in the business since they had been responsible for the growth of the business during the previous 8 or 10 years. Although reluctant to do so, decedent admitted that this was the truth but that he did not feel like doing anything about it. At a subsequent conference in the summer of 1941, decedent told Orenstein that he had been thinking about the matter and wanted to reward Barney and Moses in some way for the work they had done in building up the business by giving them something substantial. At this later conference he also told Orenstein that he wanted to give his son Solomon something since he had not been doing so well. Solomon had not been mentioned *86 in the spring discussion. During the same summer decedent also conferred about the problem with William Smith, a certified public accountant who had done the accounting work for the partnership since 1937. He told Smith that Barney and Moses had worked with him practically all their lives in building up the business and that there had been discussions about his giving them some reward for such work. Nothing was said at that time as to the manner of making any gifts. At a subsequent meeting with Smith, decedent discussed the method by which no gifts could be made. Decedent had very few assets other than his interest in the partnership. Smith advised him that he could give Barney and Moses a portion of his capital in the partnership and suggested decedent give Solomon his share of the preferred stock of the Fulton store, which stock was held by the partnership in Syracuse. On September 16, 1941, decedent visited Smith and informed him that he had definitely decided to make gifts and wanted to give Barney and Moses each $40,000 and that Smith should see that the proper entries were made in the books of the partnership. On the same date decedent then went to Orenstein's office and *87 informed him that he had instructed Smith to make the proper entries on the books and that he was giving Barney and Moses each $40,000 of his capital interest and was giving Solomon his share of the preferred stock in the Fulton store. Decedent told Orenstein "I am glad to stop all this talk. It will be a relief to get if off my mind. They can have it and I will continue in the business." Decedent had brought some of the firm's stationery with him; and while he waited, Orenstein dictated the following letter: "Oswego Syracuse Fulton "The Store that Confidence Built "M. GOLDBERG & SONS Complete Home Furnishers Jewelry - Radios 253-259 North Salina Street Phone 2-3153 SYRACUSE, N. Y.
"Sept. 16, 1941 "M. Goldberg & Sons, 253-259 North Salina St., Syracuse, New York. "My Dear Sons: "In appreciation of your loyalty and devotion which you have shown in your conduct at our store and the love and affection I have towards you, I make the following gifts: "From my capital account as stated in the last annual statement of the affairs of M. Goldberg & Sons, I give irrevocably to my son, Moses Goldberg, the sum of Forty thousand ($40,000.00) Dollars; "From my capital account *88 as stated in the last annual statement of the affairs of M. Goldberg & Sons, I give irrevocably to my son, Barney Goldberg, the sum of Forty thousand ($40,000.00) Dollars. "I have this day directed that proper entries be made on the books of our partnership and that the capital accounts of my sons, Moses Goldberg and Barney Goldberg, be increased in the amount of the above gifts. "In appreciation of my love and affection for my son Sol. E. Goldberg, I give him irrevocably, my shares of perferred stock in the corporation, Meyer Goldberg & Sons of Fulton, Inc., valued at $15,000.00 "I trust that these gifts will be an added incentive to the end that we may enjoy many more years of happy and pleasant relationship. "Affectionately yours, "(Sgd) Meyer Goldberg." Decedent said that was the way he wanted it and signed the letter which Orenstein suggested he take with him so that the accountant could make it a part of the record to substantiate the book notations. Decedent returned to Smith's office and showed him the letter. Decedent personally delivered the letter to Barney several days later, and Barney thereafter kept it in his desk. The following entry was made in the partnership *89 journal in regard to these gifts: September 16, 1941
Dr.
Cr.
Meyer Goldberg - Capital
$ 95,000.00
To: Barney Goldberg - Capital a/c
$ 40,000.00
Moses Goldberg - Capital a/c
40,000.00
Stock - Meyer Goldberg & Sons of Fulton
15,000.00
To record gift by Meyer Goldberg: To: Barney Goldberg
40,000.00
Moses Goldberg
40,000.00
Sol Goldberg
15,000.00
The capital accounts of each of the partners in the General Ledger of the partnership for 1941 show the following entries: 1941
Jan. 1
Meyer Goldberg - Capital Account - Balance
$110,551.03
Sept. 16
To: Barney, Moses and Sol Goldberg
$95,000.00
Dec. 31
From P & L
38,342.54
Dec. 31
Drawing Account
3,934.62
Dec. 31
Reserve for Unrealized Gross Profit
17,771.00
Balance 12/31/41
$ 32,187.95
1941
Jan. 1
Moses Goldberg - Capital Account - Balance
$108,585.08
Sept. 16
From Meyer Goldberg
40,000.00
Dec. 31
From P & L
44,732.96
Dec. 31
Drawing Account
$ 5,913.81
Dec. 31
Reserve for Unrealized Gross Profit
20,732.83
Balance 12/31/41
$166,671.40
1941
Jan. 1
Barney Goldberg - Capital Account - Balance
$121,211.48
Sept. 16
From Meyer Goldberg
40,000.00
Dec. 31
From P & L
44,732.97
Dec. 31
Drawing Account
$ 8,331.64
Dec. 31
Reserve for Unrealized Gross Profit
20,732.84
Balance 12/31/41
$176,879.97
*90 Each partner's share on September 16, 1941, in the Reserve for Unrealized Gross Profit was: Meyer Goldberg
$72,050.86
Moses Goldberg
84,059.33
Barney Goldberg
84,059.33
Gift tax returns were duly filed and gift taxes paid. These were the only gifts decedent ever made to Barney and Moses. No change was made in the percentage distribution of the partnership. Orenstein had told decedent that he could give part of his capital account away without disturbing the profit-sharing arrangement. The partnership of Meyer Goldberg & Sons had always operated under an oral agreement. There had been talk of having a written agreement, but it was always neglected. In October, 1941, the parties met with an attorney pursuant to executing a written partnership agreement. After numerous conferences one was signed on December 4, 1941. The agreement provided for the continuation of the partnership then existing with the capital consisting of that capital "now in said business" as shown on the partnership books. Barney and Moses were to continue to draw 35 per cent of the profits each and decedent 30 per cent as under the oral agreement. It was provided that the capital accounts *91 need not be maintained in the same proportion under which they existed at the time of the agreement, and that these proportions of sharing in the profits (or losses) should remain constant irrespective of the amounts in the particular capital accounts of the individual partners. No withdrawals were to be made from the capital of the partnership over and above $2,000 per year per partner without the unanimous written consent of all the partners. Barney and Moses were to devote full time and attention to the partnership business, but decedent was not required to do so, although he was to continue to draw his full salary. It was provided that Barney and Moses and/or their wives could each draw a salary not exceeding $200 per week, and that decedent could draw a salary not exceeding $85 per week. None of the partners could dispose of or assign or pledge his share of any interest in the partnership except that decedent could transfer any portion of his capital account to either Barney or Moses and that Barney or Moses could transfer any portion of their capital accounts to their wives or children. Provision was made for the continuation of the partnership upon the death of decedent *92 and for the purchase of his share by Barney and Moses but no provision was made in case of the death of either Barney or Moses. Barney and Moses never discussed the question of getting a greater share of the profits in the business than they received before or after the gifts were made. They were afraid to suggest such a proposition to the decedent. In 1942 Barney and Moses withdrew from the partnership their respective shares in the preferred stock of the Fulton store corporation, and each of their capital accounts was charged with $17,500 on account of such withdrawal. The preferred stock of the Fulton store corporation was redeemed in 1943, and at that time Solomon received his $15,000 in cash and Barney and Moses received $17,500 in cash. Petitioner executed his last will and testament on December 15, 1941. Barney was not aware that his father made a will until after decedent's death. In the will decedent provided for a number of small bequests to individuals and organizations. A portion of his estate was set aside in trust for his widow for her life. She was also given the power, in her sole discretion, to invade the principal. Solomon was bequeathed $45,000 and Abraham $40,000. *93 The residue of his estate and the corpus of the trust upon his wife's death were bequeathed to decedent's four sons share and share alike or to their survivors. Solomon and Abraham were appointed executors of the will. At the time decedent made the gifts in September, 1941, he was about 72 years old and in good health. He continued in good health until his last illness about a week before his death, in August, 1945. The gifts to Barney, Moses, and Solomon on September 16, 1941, were not transfers made in contemplation of death, nor were they transfers to take effect at or after decedent's death. Opinion RICE, Judge: The issue with which we are concerned is whether the gifts of $40,000 each to Barney and Moses and $15,000 to Solomon were made in contemplation of death or were intended to take effect in possession or enjoyment at or after decedent's death within the meaning of section 811 (c) of the Internal Revenue Code. [1]
*94 Whether a gift is made in contemplation of death is a question of fact for this Court to decide. It involves the determination of the subjective intent of the donor at the time the gifts are made. The gift is considered made in contemplation of death if the dominant or impelling motive of the donor is the distribution of property in anticipation of death (in effect a testamentary disposition) rather than a motive associated with life. United States v. Wells, 283 U.S. 102 (1931). In the instant case decedent made the gifts in September, 1941, about four years prior to his death. There is therefore no presumption under the Code that such gifts were made in contemplation of death. At that time, although decedent was about 72 years of age, he was in good health and active in the business. He remained in good health until about a week before his death in August, 1945. Decedent's principal motive in giving Barney and Moses each $40,000 was to reward them for their efforts in building up the business. Until 1919 when decedent went into partnership with Barney and Moses, he had been unable to make a satisfactory living. While he was considered a shrewd business man by Barney, *95 he was not a very good salesman. It was primarily through the efforts and industry of Barney and Moses that the partnership was successful. While reluctant to admit this, the decedent's conferences with Orenstein showed that he realized that fact. For several years prior to the time of the gifts, Barney and Moses had had many discussions with decedent about the latter making them some financial reward. Decedent was anxious to have such constant harassment cease and desired to restore tranquility in the family. Such a desire is a life motive. See Estate of Frank F. Tillotson, 44 B.T.A. 644 (1941). The fact that the decedent made his will and the partnership agreement was put into writing at about the same time does not, in our opinion, compel a conclusion that these gifts were made in contemplation of death. For a number of years the parties had discussed the fact that the partnership agreement should be reduced to writing but had neglected to do so. Nor are any provisions of the agreement of such character as to indicate that it was part of an over-all plan by decedent. It is only natural that the agreement should provide for what should happen upon decedent's death *96 since at that time decedent was about 72 years old. That Abraham received $40,000 in decedent's will and Barney and Moses received no specific bequest other than their shares of the residue of the estate and of the trust corpus upon decedent's widow's death, fails to convince us that in effect the gifts of $40,000 to Barney and Moses were testamentary in character. Decedent gave Solomon $15,000 at the same time that he gave gifts to Barney and Moses, and under the terms of the will Solomon was to receive $45,000. Under such circumstances, after considering all the facts, we hold that the gifts to Barney and Moses were not made in contemplation of death within the meaning of section 811 (c). The gift of $15,000 to Solomon was made primarily because Solomon had never been too successful in business. Such a desire by a father to help a son is definitely a life motive. Our conclusion that the gift of $15,000 to Solomon was not made in contemplation of death, but rather to help out a son who was not very successful in business, is strengthened by the fact that decedent in his will gave Solomon $45,000 in addition to a share of the residue of the estate. Respondent argues that even *97 if the gifts were not made in contemplation of death, they should be included in decedent's gross estate as having been intended to take effect in possession or enjoyment at or after decedent's death. The basis for such argument is that, while the gifts of $40,000 of the capital account were transferred to Barney and Moses, decedent retained his same percentage in the profit distribution which he had received before such transfers and therefore retained the income from such property (the gifts) until his death. Respondent points to the partnership agreement provision limiting withdrawal by any partner from his capital account of $2,000 per year. The gifts to Barney and Moses were made in September, 1941, and were complete and irrevocable. The partnership agreement was signed several months after the gifts were made. Transfer of the capital account was the means chosen primarily because decedent had very few assets other than his partnership interest. The partnership business was principally a credit type of business and required large inventories and a large amount of capital. The money was left in the business, not because of any condition imposed by decedent, but because the business *98 needed large amounts of capital. Barney and Moses need not have agreed to the limitation in the partnership agreement as to the amounts of capital each could withdraw. Then too, more than this $2,000 per year could be withdrawn by any partner with the unanimous written consent of the other partners. They also could have withdrawn these amounts of capital had they so desired in the interval between the making of the gift and the signing of the partnership agreement. While provision was made for profit distributions in the same percentages as that existing prior to the time of the gifts by decedent, the partnership agreement also provided for salaries for the partners. Barney and Moses could each draw up to $200 a week while decedent could only draw up to $85 per week. The higher salaries of Barney and Moses assumedly took into consideration the larger capital they then owned. It is a well-known fact that percentage sharing of profits in a partnership is not necessarily proportionate to the capital invested by each partner. The stock given Solomon is even more clearly not within this section of the statute. In 1943, Solomon received $15,000 in cash for such stock which had been withdrawn *99 from the partnership at the time of the gift. Under such circumstances we hold that none of the gifts were transfers which were intended to take effect in possession of or enjoyment at or after decedent's death within the meaning of section 811 (c). Decision will be entered under Rule 50. Footnotes
1. SEC. 811. GROSS ESTATE. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated, except real property situated outside of the United States - * * * (c) TRANSFERS IN CONTEMPLATION OF, OR TAKING EFFECT AT, DEATH. - (1) GENERAL RULE. - To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise - (A) in contemplation of his death. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter; or (B) under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (i) the possession or enjoyment of, or the right to the income from, the property, or (ii) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; or (C) intended to take effect in possession or enjoyment at or after his death. (2) TRANSFERS TAKING EFFECT AT DEATH - TRANSFERS PRIOR TO OCTOBER 8, 1949. - An interest in property of which the decedent made a transfer, on or before October 7, 1949, intended to take effect in possession or enjoyment at or after his death shall not be included in his gross estate under paragraph (1) (C) of this subsection unless the decedent has retained a reversionary interest in the property, arising by the express terms of the instrument of transfer and not by operation of law, and the value of such reversionary interest immediately before the death of the decedent exceeds 5 per centum of the value of such property. For the purposes of this paragraph, the term "reversionary interest" includes a possibility that property transferred by the decedent (A) may return to him or his estate, or (B) may be subject to a power of disposition by him, but such term does not include a possibility that the income alone from such property may return to him or become subject to a power of disposition by him. * * *↩